UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x
:
MICHAEL G. BRAUTIGAM,                     :
:
                      Plaintiff,         :         11-CV-2693 (TPG)
:
    – against –                         :         **OPINION**
:
ROBERT E. RUBIN, et al.,                  :
:
                      Defendants.        :
:
------------------------------------------x

      This is a derivative action brought on behalf of nominal defendant Citigroup, Inc. against several corporate directors. Plaintiff Michael Brautigam alleges that these defendants breached their fiduciary duties to the company and its shareholders by failing to properly oversee the company's mortgage-servicing operations. This failure of oversight, plaintiff alleges, caused Citigroup to suffer liability and reputational harm. In addition, plaintiff contends that the board's recommendation to reject a shareholder proposal without disclosure of certain facts constitutes a breach of its duty of disclosure.

      Defendants move to dismiss the complaint. The motion is granted.

**Procedural Background**

      Plaintiff filed this action on April 20, 2011. The court consolidated this case with another, and on February 14, 2012, plaintiff filed a consolidated complaint. Plaintiff amended that complaint on May 15, 2012. On March 29, 2013, the court dismissed plaintiff's amended consolidated complaint with leave to amend. On September 19, 2013, plaintiff filed the second amended consolidated complaint.

## The Complaint

*The Parties*

Plaintiff Michael Brautigam, a citizen of Ohio, is currently a Citigroup shareholder who purchased his shares in the company before the events described in the complaint.

Nominal defendant Citigroup is a Delaware corporation with its principal place of business in New York City.  Citigroup is a holding company for a global portfolio of financial-services companies.  The Citigroup corporate charter contains the following exculpation provision:

> No director of the Corporation shall be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit.

Individual defendants are Robert E. Rubin, C. Michael Armstrong, John M. Deutch, Anne M. Mulcahy, Vikram Pandit, Alain J.P. Belda, Timothy C. Collins, Jerry A. Grundhofer, Robert L. Joss, Andrew N. Liveris, Michael E. O'Neill, Richard D. Parsons, Lawrence R. Ricciardi, Judith Rodin, Robert L. Ryan, Anthony M. Santomero, Diana L. Taylor, William S. Thompson, and Ernesto Zedillo.  All are current or former Citigroup directors.  None are citizens of Ohio.

Plaintiff has not demanded that the current Citigroup board institute litigation against defendants.

*Citigroup's Mortgage-Servicing Business*

One of Citigroup's many enterprises was mortgage servicing—essentially, collecting mortgage payments from the mortgagors and distributing the proceeds. This service included default management (taking defaulted residential loans through foreclosure) and loss mitigation (negotiating alternatives to foreclosure, such as repayment plans and loan modifications). The collapse of the residential mortgage market in 2007 caused Citigroup to shift its mortgage-servicing business to focus on default management and loss mitigation.

The essence of the complaint is that the director defendants were aware of, but failed to heed, red flags that would have alerted them to problems in Citigroup's mortgage-servicing business. Plaintiff asserts that Citigroup's directors wrongfully permitted Citigroup to engage in unlawful foreclosure practices and failed to ensure adequate internal controls in its mortgage-servicing business.

*The Red Flags*

In the lead-up to the relevant period for this suit—February 18, 2008 through April 25, 2011—Citigroup allegedly received warnings about problems with its mortgage servicing. But the bulk of the warnings alleged before 2008 relate to general deterioration in the housing market and Citigroup's financial exposure as the originator of risky subprime loans. For example, in August 2007, Citigroup's former CEO Charles Prince warned Citigroup about the bleak state of the credit markets, and in September 2007, Citigroup officials attended meetings discussing the fallout in the real estate market. These warnings were all unrelated to Citigroup's mortgage-servicing. But the complaint does identify three communications from the Federal Reserve Board that implicated the mortgage-servicing industry. These letters explained the Board's expectations for proper

residential-loan servicing.  But no letter was specifically directed at or specifically about Citigroup; rather, the letters were published by the Board to "encourage federally regulated financial institutions and state-supervised entities" to pursue certain strategies.

According to the complaint, the most important red flags came in the form of letters from two regulatory bodies.  First, on February 14, 2008, the Office of the Comptroller of the Currency delivered a letter summarizing its examination of director and management oversight at Citigroup during the second half of 2007.  The letter pointed to risk-management failures at Citigroup.  Two months later, in April 2008, the Federal Reserve Bank similarly criticized Citigroup's weak risk-management practices and internal-control failures.  The complaint, however, does not allege that these letters were about the specific risk-management failings that form the basis for plaintiff's lawsuit—i.e., failures in Citigroup's residential mortgage servicing.

In 2008, Citigroup also received two communications from the Department of Housing and Urban Development (HUD).  First, HUD issued results of its audit of Citigroup's mortgage underwriting, determining that 30% of Citigroup's loans were not in compliance with federal underwriting standards.  This audit did not address mortgage servicing.  Second, in December 2008, HUD issued "Mortgagee Letters," which advised all HUD-approved mortgagees regarding pre-foreclosure-sale requirements.  Although this letter related to Citigroup's mortgage-servicing activities, the letter was addressed to many mortgage servicers and did not identify any deficient mortgage-servicing or foreclosure practices at Citigroup.

Also in 2008, Citigroup participated in the federal government's Troubled Asset Relief Program (TARP) and Asset Guarantee Program (AGP).  TARP was designed to

ensure the stability of major financial institutions by authorizing the United States Treasury to purchase troubled assets and provide guarantees for assets left on financial institutions' balance sheets.  As a participant in TARP, Citigroup was required to offer a loan-modification process to mortgage-service consumers.  Additionally Citigroup was required to put in place effective controls to ensure that it was providing mortgage services in compliance with consumer-protection and fair-lending laws.  The Asset Guarantee Program was similar to TARP and required Citigroup to create a special internal oversight body, the Senior Oversight Committee, to oversee the management of the guaranteed assets and other aspects of compliance with the Program.  It also required the designation of a "covered assets CEO" who would personally monitor the management of the guaranteed assets and report to the broader Senior Oversight Committee.  Citigroup negotiated its exit from TARP and AGP in December 2009.

*Governmental Industry-Wide Review of Foreclosure Practices*

Beginning in October 2010, the nation's major mortgage servicers came under scrutiny because of alleged irregularities in foreclosure processes across the industry.  These investigations included allegations of "robo-signing"—employees signing large numbers of affidavits submitted in support of foreclosure claims without any personal knowledge of the information contained in the affidavits.  Numerous governmental entities, including several federal agencies and state attorneys general, commenced investigations or proceedings against most major financial institutions.  Also in late 2010, the Office of Inspector General commenced a nationwide review of the foreclosure practices of the five largest Federal Housing Administration mortgage servicers, including Citigroup.

In late 2010, New York and New Jersey state courts flagged problems in Citigroup's mortgage-servicing processes.  In October 2010 New York's Chief Administrative Judge ordered Citigroup's attorneys to submit affirmations that they had inspected pending foreclosure documents and that they were complete and correct.  As one of the company's lawyers informed the court, Citigroup "did not have in place, prior to November 8, 2010, procedures to comply with the Administrative Order."  In December 2010 the New Jersey court system directed Citigroup to show cause why pending New Jersey foreclosures should not be suspended.  Citigroup responded by admitting that over one third of its foreclosure affidavits were faulty and that it would dismiss those actions.

On November 18, 2010, a congressional committee held a hearing on robo-signing and other issues in mortgage servicing.  Among others, Harold Lewis, a CitiMortgage executive, provided testimony, explaining that in the late 2009, Citigroup had identified issues in its foreclosure processes and took steps to address them.  Among other things, Citigroup centralized its foreclosure operations into a single unit, added staff and enhanced training, required greater accountability, and undertook a review of tens of thousands of foreclosure files.

In January 2011, a coalition of pension funds, led by New York Comptroller John C. Liu, called on the boards of directors of Bank of America, Citigroup, JPMorgan and Wells Fargo to undertake independent examinations of the banks' mortgage and foreclosure practices.  All four banks recommended against the proposal.  As Citigroup's management explained in its proxy statement dated March 10, 2011, "the independent Audit Committee has [already] conducted independent reviews, through its independent

audit function . . . of Citigroup's internal controls relating to loan modifications, foreclosures and securitizations."

On April 13, 2011, the Office of the Comptroller of the Currency announced that Citibank and 13 other financial institutions had entered into consent agreements to resolve enforcement actions coordinated among the federal banking regulators. (Citigroup's directors had signed the agreement on March 27 and 29, 2011.)  The consent order required mortgage servicers to address deficiencies identified by the regulators during the course of their review.  In addition, each financial institution was required to engage an independent firm to conduct a review of foreclosure actions taken during 2009 and 2010.

A week later, on April 21, 2011, Citigroup hosted its annual meeting, at which the Liu Shareholder Proposal was put to a vote and overwhelmingly rejected.  Plaintiff does not allege that he cast a vote in favor of, or against, the Liu Shareholder Proposal.  Nor does plaintiff allege that he, or any other shareholder, took any steps to change his vote on the Liu Shareholder Proposal or otherwise contest the rejection of the proposal at the annual meeting based on the Office of the Comptroller of the Currency Consent Order that was made public in March 2011.

On February 9, 2012, Citigroup announced that CitiMortgage, along with other major mortgage servicers, had reached an agreement with the United States and with the attorneys general for 49 states and the District of Columbia to settle a number of related investigations into residential loan servicing and origination practices.  The board had rejected a prior settlement offer in this action on March 3, 2011.  In addition to

committing to provide financial relief to homeowners, Citigroup also agreed to implement certain mortgage-servicing standards.

On March 12, 2012, the HUD Office of the Inspector General issued a report entitled "CitiMortgage, Inc. Foreclosure and Claims Process Review." That report concluded that, due to a "flawed control environment," Citigroup had misrepresented its claims to HUD and, therefore, may be liable for False Claims Act violations.

*Damage to Citigroup*

In sum, Citigroup's settlements resulted in fines and fees of more than $2 billion. Additionally, plaintiff alleges that Citigroup also suffered reputational harm.

Based on these assertions, the complaint alleges that the director defendants breached their fiduciary duties in two ways. First, plaintiff asserts that Citigroup's directors wrongfully permitted Citigroup to engage in unlawful foreclosure practices and failed to ensure adequate internal controls in its mortgage-servicing business. Second, plaintiff contends that defendants breached their duty of disclosure by recommending that shareholders reject a proposal to conduct an independent review of Citigroup's mortgage-servicing and foreclosure internal controls without disclosing a pending investigation by the Office of the Comptroller of the Currency into Citigroup's foreclosure practices. In addition, the complaint asserts a claim for contribution and indemnification.

## Discussion

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead sufficient facts to state a claim for relief that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, 677–78 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). In deciding a motion under Rule 12(b)(6), a court must accept as true

the facts alleged in the complaint.  Id.  The court's review is limited to facts stated in the complaint and in documents appended to the complaint or incorporated in the complaint by reference.  Allen v. WestPoint–Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991).

**Duty-of-Loyalty Claim**

*Demand Requirement*

Defendants argue that plaintiff was required to make a demand on the board that the company bring this suit itself against defendants.  Plaintiff contends that, because it would have been futile, demand is excused.  Here, because Citigroup is a Delaware corporation, Delaware law governs the issue of whether demand is excused.  See Rahbari v. Oros, 732 F. Supp. 2d 367, 376 (S.D.N.Y. 2010).  A court must assess demand futility with respect to the board of directors as of the time the plaintiff filed its complaint.  Braddock v. Zimmerman, 906 A.2d 776, 785 (Del. 2006).  Thus, plaintiff must show that his demand is excused based on the board as of September 19, 2013, the date on which the current complaint was filed.

To establish that he is excused from making a demand, a plaintiff must make specific, particularized allegations showing that it would have been futile to do so.  See Lewis v. Graves, 701 F.2d 245, 250 (2d Cir. 1983); In re Citigroup Inc. S'holder Derivative Litig., 964 A.2d 106, 121 (Del. Ch. 2009).  Thus, plaintiff is held to "a pleading standard higher than the normal standard applicable to the analysis of a pleading challenged under Rule 12(b)(6)."  Fink v. Weill, No. 02-cv-10250, 2005 WL 2298224, at *3 (S.D.N.Y. Sept. 19, 2005).  Accordingly, vague or conclusory allegations do not suffice to challenge the presumption of a director's capacity to consider demand."  In re INFOUSA, Inc. S'holders Litig., 953 A.2d 963, 985 (Del. Ch. 2007).

Where a plaintiff bases his complaint on board action, demand is excused if there is a reasonable doubt that (1) the directors are disinterested and independent or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment. Aronson v. Lewis, 473 A.2d 805, 814 (Del. 1984); Seminaris v. Landa, 662 A.2d 1350, 1354 (Del. Ch. 1995). Where a plaintiff bases his complaint on board inaction, the analysis focuses on the first prong of Aronson. See In re Am. Int'l Grp., Inc. Derivative Litig., 700 F. Supp. 2d 419, 430–31 (S.D.N.Y. 2010) (citing Rales v. Blasband, 634 A.2d 927, 934 (Del. 1993)).

*Failure to Oversee Mortgage-Servicing Activities*

The parties disagree about whether plaintiff bases this claim on board action or inaction, and accordingly, whether Aronson or Rales applies. Under both Rales and Aronson, reasonable doubt as to the board's ability to exercise its business judgment can be established by alleging that the members of the board faced a substantial risk of personal liability as a result of the suit. Rahbari, 732 F. Supp. 2d at 378. But "the mere threat of personal liability" is insufficient to challenge the disinterestedness of directors. Rales, 634 A.2d at 936. It is a rare case "where defendants' actions were so egregious that a substantial likelihood of director liability exists." Rahbari, 732 F. Supp. 2d at 378.

In this case, the analysis is somewhat complicated by the additional protections given to Citigroup's board under the corporate charter. Board members are exculpated from personal liability for breaches of fiduciary duty subject to certain exceptions. Because the board is "exculpated from liability except for claims based on fraudulent, illegal or bad-faith conduct, plaintiff must also plead particularized facts that demonstrate

that the directors acted with scienter." Wood v. Baum, 953 A.2d 136, 141 (Del. 2008); see also Fed. R. Civ. P 9(b).

Failure of oversight is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959, 967 (Del. Ch. 1996). In order to establish a failure-of-oversight claim, a plaintiff must show that "(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee operations thus disabling themselves from being informed of risks or problems requiring their attention." Stone ex rel. AmSouth Bancorporation v. Ritter, 911 A.2d 362, 370 (Del. 2006).

Here, plaintiff has not sufficiently pleaded a claim that Citigroup's directors failed to oversee its mortgage-servicing operations. Plaintiff concedes that Citigroup had "governance and reporting systems" that ensured the directors "were always sufficiently armed or had access to information necessary to perform their duties." The complaint alleges that the board tasked numerous committees with the responsibility of assisting in its oversight—reviewing compliance issues, auditing Citigroup's internal controls, reviewing risk-management activities, etc. There is no real dispute that Citigroup's board had sufficient reporting controls and procedures to perform its oversight function during the relevant period.

Instead, plaintiff's theory is that the internal controls *themselves* establish that the board must have had knowledge of the wrongful conduct relating to the mortgage-servicing and foreclosure practices. But courts have repeatedly rejected the attempt to use the fact that a company had internal controls as proof that the board must have been

aware of alleged wrongdoing. See In re Goldman Sachs Mortgage Servicing S'holder Derivative Litig., No. 11-cv-4544, 2012 WL 3293506 (S.D.N.Y. Aug. 14, 2012). Likewise, the allegation that a director's membership on a standing committee is sufficient to establish knowledge or a likelihood of liability is simply contrary to established law. Id. Instead, plaintiff must point to "specific red flags of such prominence that defendants must necessarily have examined and considered them in the course of their committee oversight duties." Id.

But plaintiff has failed to allege red flags sufficient to show that the board consciously failed to monitor operations related to Citigroup's mortgage servicing. Plaintiff's alleged red flags fall into three categories, and none—considered collectively or independently—is sufficient.

First, plaintiff alleges many red flags in the form of general guidance issued by government agencies. For example, the three letters from 2007 issued by the Federal Reserve Board generally described best practices within the mortgage-servicing industry. The same is true of HUD's 2008 industry-wide "Mortgagee Letters" and the general directives in the TARP and AGP agreements. These industry-wide communications, not specifically directed at Citigroup or describing Citigroup's practices, are insufficient as a matter of law. See In re Mut. Funds Inv. Litig., 384 F. Supp. 2d 873, 879 (D. Md. 2005). None of this information would have alerted the directors that Citigroup was engaged in wrongful conduct within its mortgage-servicing business.

Second, general statements about the real estate market or Citigroup's unrelated financial enterprises are insufficient to alert the directors about problems in its mortgage-servicing processes. For example, statements about Citigroup's financial exposure

because of its underwriting of subprime mortgages are irrelevant to the board's knowledge about its mortgage-servicing problems. Likewise, the 2008 letters from the Office of the Comptroller and the Federal Reserve Board are insufficient because they describe risk-management problems with Citigroup's structured-credit products, not its mortgage-servicing business. The same is true of the 2008 HUD audit of Citigroup's underwriting—not mortgage-servicing—activities. Accordingly, these allegations cannot support plaintiff's claim for demand excusal.

Third, plaintiff points to after-the-fact settlements as proof that the board must have known about the mortgage failings at the time the misconduct occurred. But an allegation that the board was aware of these settlements when they were executed suggests nothing about what it knew at the time of the alleged misconduct. See In re Johnson & Johnson Derivative Litig., 865 F. Supp. 2d 545, 552 (D.N.J. 2011). Moreover, the complaint does not contain any allegations about what the board did or failed to do in response to any of the settlements—at the time when the board certainly had knowledge of the mortgage-servicing problems. It is the board's response *when it has knowledge* that is relevant for the failure-of-oversight claim. Without that kind of allegation, the complaint falls far short of pleading that the directors faced a substantial likelihood of litigation by acting in bad faith.

In fact, contrary to the supposed red flags, the complaint contains allegations that Citigroup was proactively responding to revelations about problems in its mortgage-servicing failures. For example, in 2010, Harold Lewis testified before Congress that Citigroup had identified problems in its foreclosure processes and was taking steps to correct them. It cannot be said that the directors faced a substantial likelihood of liability

where the complaint "explicitly states that Director defendants took affirmative actions with respect to the robo-signing practices." City of Roseville Emps.' Ret. Sys. v. Dimon, Index No. 650294/2012, slip op. at 14 (N.Y. Sup. Ct. July 11, 2012).

*Liu Shareholder Proposal*

Plaintiff also alleges that the board breached its duty by recommending in March 2011 that shareholders reject the Liu proposal without disclosing (1) that the board rejected a March 3, 2011, proposal to settle a number of related governmental investigations into its mortgage-servicing practices (later resolved in February 2012) and (2) the consent order announced by the Office of the Comptroller of the Currency on April 13, 2011. Because this claim challenges an affirmative action of the board, demand futility must be evaluated under both prongs of Aronson: plaintiff must plead particularized facts sufficient to create a reasonable doubt as to whether (1) a majority of the directors are disinterested and independent or (2) the challenged transaction was the product of a valid exercise of business judgment. 473 A.2d at 814.

Under Delaware law, a director is not liable for an omitted disclosure unless the director withheld facts knowingly and the omission was material. Here, information that Citigroup had entered settlements regarding wrongful conduct in its mortgage-servicing processes was certainly material in determining whether an outside audit of those activities should be conducted. But even if that information was material, the settlement with Office of the Comptroller—signed *after* Citigroup issued its proxy statement—was public information before the April 2011 shareholders meeting, so plaintiff cannot contend that he did not have the ability to cast an informed vote at the meeting. Moreover, plaintiff's claim fails because the board was under no duty to disclose the

settlements before they were finalized; disclosure at any earlier point would have been premature and speculative.  See In re W. Nat'l Corp. S'holders Litig., No. 15927, 2000 WL 710192, at *28 (Del. Ch. May 22, 2000).

Likewise, plaintiff cannot carry his "heavy burden" of showing that the recommendation to reject Liu's proposal was not based on business judgment.  White v. Panic, 783 A.2d 543, 551 (Del. 2001).  If the board's judgment can be "attributed to *any* rational business purpose," the court "will not substitute its own notions of what is or is not sound business judgment."  Sinclair Oil Corp. v. Levien, 280 A.2d 717, 720 (Del. 1971).  Here, the board explained that the Liu proposal should not be adopted because the Audit Committee already had undertaken and independent review of Citigroup's internal controls relating to loan modifications, foreclosures, and securitizations.  This explanation is sufficient to bring the board's action within the business-judgment rule.  Accordingly, plaintiff has failed to state a claim for breach of fiduciary duty based on the board's recommendation.

**Contribution and Indemnification**

Because plaintiff has failed to establish that demand is excused, Plaintiff's contribution and indemnification claims are also dismissed.  See In re Goldman Sachs Mortgage Servicing S'holder Derivative Litig., 2012 WL 3293506.

### Conclusion

The motion to dismiss is granted.  This opinion resolves the motion listed as document number 40 in this case.  The clerk of the court is instructed to close this case and the consolidated case, 11-cv-2822.

SO ORDERED

Dated: New York, New York
September 24, 2014

Thomas P. Griesa
U.S. District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/24/14